**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **)** | |
| | **)** | |
| **v.** | **)** | **Crim. No. 2:16cra128** |
| | **)** | |
| **CHADWICK STANLEY GHESQUIERE** | **)** | |
| | **)** | |
| **Defendant.** | | |

**DEFENDANT'S POSITION WITH RESPECT TO SENTENCING FACTORS**

The Defendant, Chadwick Stanley Ghesquiere ("Mr. Ghesquiere"), by counsel, in accordance with Section 6A1.2 of the Sentencing Guidelines and Policy Statements, as well as this Court's sentencing Order, hereby represents that he has reviewed the Probations Officer's Presentence Report (PSR). He has two objections to the report, neither of which affects his guidelines. Mr. Ghesquiere also hereby states his position with respect to sentencing factors.

**THE SENTENCE REQUESTED**

Mr. Ghesquiere is before this Court for sentencing after pleading guilty on October 11, 2016 to Count One of the Indictment, charging him with Use of Interstate Commerce Facilities in the Commission of Murder for Hire, in violation of 18 U.S.C. § 1958(a), and Count Six, charging him with Use of a Communication Facility in Committing or Causing or Facilitating the Commission of Any Act or Acts Constituting a Felony, in violation of 21 U.S.C. § 843(b). Sentencing is set for January 23, 2017.

For the reasons set forth herein, Mr. Ghesquiere respectfully asks this Court to impose a sentence below the advisory guideline range. In sum, he is a 38 year old man with no criminal history who made one poor decision, driven by the love of his son, constituting the instant offense. Mr. Ghesquiere witnessed and experienced immense abuse as a young child but he persevered and

developed into a loving father who also served his Country. He has already suffered from immense public and private shame and embarrassment from this matter. A sentence below the advisory guideline range will more than satisfy the purposes of sentencing as set forth in 18 U.S.C. § 3553(a).

## GUIDELINE OBJECTIONS

### 1. Possession of a dangerous weapon

The PSR assigns Mr. Ghesquiere a two (2) level enhancement for possession of a dangerous weapon, pursuant to U.S.S.G. §2D1.1(b)(1). PSR ¶ 35. Section 2D1.1(b)(1) of the Guidelines provides, "If a dangerous weapon (including a firearm) was possessed, increase by 2 levels." U.S.S.G. §2D1.1(b)(1).

Mr. Ghesquiere objects to this two level enhancement. An enhancement under §2D1.1(b)(1) is used to reflect the "increased danger of violence when drug traffickers possess weapons." U.S.S.G. §2D1.1, comment. (n. 11(A)). However, the enhancement should not be applied if "it is clearly improbable that the weapon was connected with the offense." *See* U.S.S.G. § 2D1.1, n. 11(A). Here, the weapon was not connected with a drug offense. Rather, it was provided for use in an attempted murder-for-hire. In fact, Mr. Ghesquiere provided the undercover agent with the Adderall pills and the gun on *separate* occasions. *See* PSR ¶¶ 13(10), (16) (indicating that Mr. Ghesquiere provided the undercover agent with a firearm on August 10, 2016, and the Adderall pills on August 16, 2016).

Because the Adderall pills were only present as a form of payment upon request from the undercover agent and the possession of the gun was not related to the distribution of amphetamine, the two level enhancement should not be applied.

**2. Directed use of violence**

The probation officer also assigned Mr. Ghesquiere a two (2) level enhancement for "use of violence, threats of violence, or directed use of violence" pursuant to U.S.S.G. §2D1.1(b)(2). PSR ¶ 36. This specific offense characteristics provides that, "If the defendant used violence, made a credible threat to use violence, or directed the use of violence, increase by 2 levels." U.S.S.G. §2D1.1(b)(2). Such an enhancement, however, does not apply when the defendant "merely possessed a dangerous weapon but did not use violence, make a credible threat to use violence, or direct the use of violence." *See* U.S.S.G. §2D1.1, n. 11(B). Mr. Ghesquiere simply provided the undercover agent with the gun, as requested by the undercover agent. Mr. Ghesquiere did not use the gun in a threatening or violent way when he provided the Adderall to the undercover agent. Moreover, Mr. Ghesquiere never directed the use of violence while distributing the Adderall. Nor did Mr. Ghesquiere direct the undercover agent to use to the weapon to kill K M-G; instead, the undercover agent was the one that told Mr. Ghesquiere he needed a gun and demanded that Mr. Ghesquiere provide one to him.

Accordingly, the defense requests that this Court find that neither two level enhancement should apply to Mr. Ghesquiere and that his base offense level for Count Six should be twelve (12).

**THE APPROPRIATE SENTENCE IN THIS CASE**

The overriding principle and basic mandate of 18 U.S.C. § 3553(a) requires district courts to impose a sentence "sufficient, but not greater than necessary," to comply with the four purposes of sentencing set forth in Section 3553(a)(2). This requirement is not just another factor to be considered along with the others set forth in Section 3553(a), but instead, sets an independent limit on the sentence.

Accordingly, Congress has required federal courts to impose the least amount of imprisonment necessary to accomplish the purposes of sentencing. The law must "tak[e] into account the real conduct and circumstances involved in sentencing" as well as the defendant's personal history and characteristics. *Gall v. United States*, 552 U.S. 38, 54 (2007); 18 U.S.C. § 3553(a)(1). The Court must "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Id.* at 52.

**The Nature and Circumstances of the Offense as They Relate to the Sentencing Factors**

Mr. Ghesquiere's conduct is explained in the Statement of Facts. ECF No. 24. In sum, Mr. Ghesquiere was having marital problems and was going through a divorce. In or about early July of 2016, Mr. Ghesquiere and his wife got into a dispute because his wife would not let Mr. Ghesquiere see their son, BG, even though Mr. Ghesquiere had joint custody and was entitled to see his son. Extremely frustrated by the situation (and previous similar situations), and concerned for his son, Mr. Ghesquiere commented to his friend that it would be much easier if his wife was not around. Determined to see his son, who he feared was in "harm's way," and in a state of resentment towards his wife, Mr. Ghesquiere offered his friend money to help get rid of his wife.

His friend then arranged for Mr. Ghesquiere to meet with an undercover agent who was posing as a "hit man." The friend, undercover agent, and Mr. Ghesquiere met a couple of times in order to discuss the logistics. Mr. Ghesquiere admitted that he wanted to go through with the plan and followed the directions of the undercover agent, including, providing him with $1,000 cash and eighty (80) pills of 30 milligram Adderall for down payment, as well as giving him a gun (which was later determined inoperable). Throughout the meetings, Mr. Ghesquiere reiterated that

he just wanted his son back and "out of harm's way." PSR ¶ 19; *see also* PSR ¶ 18 (noting that Mr. Ghesquiere stated it was "not about the money" it was "about his son").

While Mr. Ghesquiere recognizes what he did was very wrong and he is not trying to excuse his behavior, it was an isolated event triggered by desperation to see and help his son. Mr. Ghesquiere has been cooperative with all aspects of the investigation and admitted to his actions immediately. Mr. Ghesquiere has pled guilty and accepted full responsibility.

**The History and Characteristics of Mr. Ghesquiere as They Relate to the Sentencing Factors**[1]

Mr. Ghesquiere was born and raised in Toledo, Ohio. As a child, Mr. Ghesquiere was frequently ill, causing him to remain isolated and spend his time alone while other young children played together outside enjoying the snow and other activities. Mr. Ghesquiere would watch from inside his house, longing to join, but restricted to low-impact activities due to a blood disorder that caused him to bruise easily and have internal bleeding. Mr. Ghesquiere also suffered from other ailments as a young child that took a heavy toll on his body and personal life.

His poor medical conditions, while certainly a hindrance, also served to protect him. Mr. Ghesquiere's biological father was physically and emotionally abusive to Mr. Ghesquiere's siblings; but, Mr. Ghesquiere's disease shielded him from the abuse of his father, who was too afraid to hit him due to his blood disorder. His biological father was also physically and emotionally abusive to Mr. Ghesquiere's mother. Mr. Ghesquiere's father even took the time to make a special paddle to beat the family members, where he drilled holes in the ore in order to enhance the sting as he struck someone with the paddle. Afraid of his father, Mr. Ghesquiere would go in his room and hide under the covers whenever he heard his parents fighting. He kept

[1] Some of the information noted in this section does not appear in the PSR. Rather, the information was obtained by the defense from interviews with family members of Mr. Ghesquiere.

quiet as child, keeping all of his emotions inside and trying not to draw attention to the problems at home. Mr. Ghesquiere's biological father was eventually arrested, convicted and sent to prison.

Mr. Ghesquiere may have escaped the physical abuse from his father, but he was forever scarred by the emotional abuse inflicted on him, as well as the physical and emotional abuse he witnessed applied on his sisters and mother. These memories haunt Mr. Ghesquiere; and thus, when Mr. Ghesquiere feared that his own son was in "harm's way" of K M-G, Mr. Ghesquiere wanted to do everything he could to protect his son so that his son never had to experience what he, his sisters, or his mother had to experience from his biological father. *See* PSR ¶ 19 ("When [ATF agents] asked what made him want to kill K M-G, Ghesquiere stated, 'I just want my kid out of harm's way.'").

Around the time that Mr. Ghesquiere's father was prosecuted and sent to prison, Mr. Ghesquiere's parents also divorced. Shortly thereafter, his mother remarried to Shawn Prephan, who Mr. Ghesquiere admired. Shawn helped Mr. Ghesquiere in grade school and even volunteered to coach Mr. Ghesquiere's football team at Church. Because Mr. Ghesquiere's medical ailments improved as he grew older, he was able to participate in more activities. In fact, Mr. Ghesquiere played football for his Church, baseball for his town, and basketball with his school. When Shawn was not coaching Mr. Ghesquiere's football team, he made a concerted effort to attend Mr. Ghesquiere's other sporting events. Not only did Mr. Ghesquiere participate in sports, he also served as an altar boy and a Boy Scout.

Mr. Ghesquiere graduated from Bedford High School in Temperance, Michigan in 1996. From there, he learned how to weld after attending a vocational school, where he earned the top graduating spot in the program. Mr. Ghesquiere is a hard worker and always sought employment. He worked at Reliance Propane and Oil, as well as Campbell's Soup Company before becoming

a disk jockey ("DJ"). As a DJ, he would work at local clubs, but the work was never steady; so, in 2008 he decided to join the Navy. By this time, Mr. Ghesquiere was recently married to K M-G and they had a baby on the way. Mr. Ghesquiere wanted a better life for his wife and child, so they moved to the Hampton Roads area for his military service.

The birth of Mr. Ghesquiere's son brought immense joy to Mr. Ghesquiere's life. Shortly thereafter, however, Mr. Ghesquiere was deployed to Bahrain. While serving overseas, his wife revisited her relationship with her ex-husband and she began using drugs and alcohol again. This tore Mr. Ghesquiere and his wife apart, eventually leading to a separation in 2012. Mr. Ghesquiere and K M-G shared joint custody of their son, but Mr. Ghesquiere always feared for his son's life when he was at his mother's house. For instance, Mr. Ghesquiere recalls how his son would tell him that he was hungry because his mother was too drunk to cook him dinner. Another time, Mr. Ghesquiere noticed a burn on his son's leg, which he found out occurred while his son was at K M-G's house and her older son, from a previous relationship, burned a cigarette into his leg.

Mr. Ghesquiere always wanted to provide his son what he himself never had as a child – a stable home life. When Mr. Ghesquiere was unable to fully protect his son in the way that he wanted to, he felt helpless and buried himself in his work. Mr. Ghesquiere advanced from a rank E-1 to E-5 in the military, accomplishing many achievements and receiving awards along the way. For the dates of May 9, 2014 to April 30, 2015, Mr. Ghesquiere received a Meritorious Unit Commendation. He also completed training courses in a variety of subjects, including cyber awareness, combat trafficking, antiterrorism, fire prevention, mishap reduction, Navy fall protection, and risk management, just to name a few. Mr. Ghesquiere's most recent evaluation, dated March 30, 2016, described him as a "team builder, extremely reliable and a command/community advocate." PSR ¶ 70. Prior evaluations echo this sentiment, describing

Mr. Ghesquiere as an "extremely knowledgeable and dedicated maintenance technician[,]" "dependable," "outstanding," "meticulous," "has unlimited growth potential" and is "ready for increased authority and responsibility." *See* PSR § 70. Mr. Ghesquiere was also recommended for advancement to First Class Petty Officer. He has also received several medals to include War on Terrorism, Service, Good Conduct, Navy "E" Ribbon, and National Defense. Mr. Ghesquiere was honorably discharged from the Navy in March 2016, but then obtained a Certificate of Reenlistment when he joined as an Aviation Structural Mechanic.

The health issues Mr. Ghesquiere faced as a child have improved; however, he now suffers from sleep apnea. In 2012, he joined a sleep study at the Portsmouth Naval General Hospital in Portsmouth, Virginia, where he was prescribed Adderall 30mg (twice a day) to help him stay "focused" throughout the day. Mr. Ghesquiere also suffers from narcolepsy and he wishes to continue treatment for his sleep issues.

Mr. Ghesquiere is privileged to still have a supportive family. His mom, a retired nurse, and his stepfather, a retired teacher, currently reside together in Perrysburg, Ohio and have offered their residence to Mr. Ghesquiere as a place to stay upon his release from incarceration. His sisters currently live in Colorado and Ohio. Mr. Ghesquiere speaks to his parents frequently on the telephone, and he always expresses his love and affection for them. Mr. Ghesquiere recognizes the financial and emotional stress that he has caused his family, and he is deeply regretful.

Mr. Ghesquiere's absence of a criminal history, presence of supporting family, extensive childhood of abuse, service to this Country, and dedication to his family strongly suggest that a sentence below the advisory guideline range is sufficient but not greater than necessary to comply with the purposes set forth in § 3553(a).

**The Requested Sentence Reflects the Seriousness of the Offense, Promotes Respect for the Law, Provides Just Punishment, Affords Adequate Deterrence, and Protects the Public**

Mr. Ghesquiere respectfully submits that a sentence below the advisory guideline range is sufficient to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and afford adequate deterrence to both Mr. Ghesquiere and the public. Mr. Ghesquiere is fully aware of the consequences of his actions and he recognizes that his lapse of judgment has significantly impacted his family. Mr. Ghesquiere's poor decisions were uncharacteristic of him. His parents have remarked that this behavior was very out of the ordinary and they were "shocked" over the instant offense. Mr. Ghesquiere was trying to protect his son and he realizes this was not the way to handle the situation. He feels genuine disappointment in himself and regrets his actions that have now stripped him of the one person he was trying to protect – his son. Mr. Ghesquiere's conduct represents a marked deviation from an otherwise law-abiding life. He was an active member of the military, spent his free time remodeling his home, gave his friend a place to live, and he is a supportive and loving father and son.

Beyond the direct and immediate consequences of his actions, Mr. Ghesquiere is also subjected to a number of collateral consequences he will face as a convicted felon.[2] Under federal law alone, a felony convictions may render an individual ineligible for public housing, section 8 vouchers, Social Security Act benefits, supplemental nutritional benefits, student loans, certain tax credits, and more. *See United States v. Nesbeth*, No. 15-CR-18 (FB), 2016 WL 3022073, *12-13

[2] While there is a circuit split as to whether the collateral consequences of conviction can legally be considered as § 3553(a) factors when fashioning a sentence, the Fourth Circuit has clearly held that such considerations are permissible. *See United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (viewing the loss of the defendant's "teaching certificate and his state pension as a result of his conduct" as appropriate sentencing considerations, "consistent with § 3553(a)'s directive that the sentence reflect the need for 'just punishment' and 'adequate deterrence.'"); *Cf. United States v. Nesbeth*, No. 15-CR-18 (FB), 2016 WL 3022073, *17 (E.D.N.Y. May 24, 2016) ("It is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence.)"

(E.D.N.Y. May 24, 2016) (citations omitted). In addition to the general reluctance of employers to hire ex-offenders, felony convictions disqualify individuals from holding various positions. *Id.* at 13. Inability to procure and maintain employment results in further disastrous consequences, such as losing child custody and going homeless. *Id*. In this way, the statutory and regulatory scheme contributes heavily to many ex-convicts becoming recidivists and restarting the criminal cycle. Thus, "public safety is better served when people with criminal convictions are able to participate as productive members of society by working and paying taxes." *Doe v. United States*, 2015 WL 2452613, No. 14-MC-1412, at *8 (E.D.N.Y. May 21, 2015).

These broad range of collateral consequences serve no useful function other than to further punish people, like Mr. Ghesquiere, after they have completed their court-imposed sentences. *See id.* at *2. Mr. Ghesquiere was the main provider for his son, and his employment with the Navy also provided his family with health and dental insurance. Once Mr. Ghesquiere re-enters society, he will need to search for new employment, which will be difficult given the offense of conviction on his record.

Given that Mr. Ghesquiere's behavior was out of the ordinary and he has always been a law-abiding citizen who proudly served his country for over eight (8) years, a sentence below the advisory guidelines would meet the goals of sentencing. Such a sentence would allow Mr. Ghesquiere a chance to have a substantial and positive presence in the community upon his release.

**<u>The Need to Avoid Unwarranted Sentencing Disparity</u>**

The defense brings several cases to the Court's attention for comparison purposes and to address the factor of the need to avoid unwarranted sentencing disparity.

In *United States v. Joseph Emery Frampton*, 2:10cr171 (E.D. Va. 2010), a case from this Court, Mr. Frampton received a sentence of eighty months imprisonment following his guilty plea,

pursuant to a plea agreement, to a criminal information charging him with use of interstate communication facilities in the commission of murder-for-hire in violation of 18 U.S.C. § 1958(a). *See* ECF Nos. 33, 38 & 46. The guideline range was a restricted range of 120 months. The below guideline sentence was based, at least in part, on Mr. Frampton's testimony for the Government in the trial of his co-conspirator, Larry Eugene Lingenfelter.[3] Mr. Frampton and Mr. Lingenfelter were childhood friends. *See Statement of Facts* in *United States v. Joseph Emery Frampton*, 2:10cr171 (E.D. Va. 2010), ECF No. 39. Mr. Lingenfelter hired Mr. Frampton to kill his (Lingenfelter) ex-wife in order to stop his obligation to pay child support and related expenses to his ex-wife. *Id.* Mr. Frampton agreed and "made at least three efforts to commit the murder." *Id.* at 1. The first attempt was at the residence of the intended victim's friend in Suffolk, Virginia. *Id.* Mr. Frampton did not commit the murder due to the number of people, including children, present. *Id.* On a later date, Mr. Frampton traveled to Texas where the ex-wife lived to commit the murder (via a "large kitchen knife"). *Id.* at 2-3. Again, because there were too many people around, the murder was not committed. *Id.* The last effort was a second trip to Texas by Mr. Frampton. This time, armed with a knife, he actually broke into the ex-wife's residence, "burglarized" and "ransacked it" and waited for her to return. *Id.* at 4-5. When the ex-wife returned to her residence, Mr. Frampton was still there but, fortunately, did not go through with the murder and left. *Id.* In contrast to this case, but for Mr. Frampton having a change of heart, the murder would have occurred. Here, because law enforcement was involved, Mr. Ghesquiere's wife was in no actual harm. In other words, she was not going to be murdered despite Mr. Ghesquiere's actions and expressed intent. In addition, Mr. Frampton was the one who agreed to *commit* the murder, and

[3] Following a jury trial, Mr. Lingenfelter was found guilty of conspiracy to commit murder-for-hire and two counts of murder-for-hire in violation of 18 U.S.C. § 1958(a) and sentenced to a total of 330 months imprisonment (110 months on each count consecutive). *United States v. Larry Eugene Lingenfelter*, 2:10cr153, ECF No. 93.

made three attempts to do so. In contrast, Mr. Ghesquiere hired someone to commit the murder. While this is still very serious, there is a difference between what each man agreed to do.

In *United States v. Smith*, 755 F.3d 645 (8th Cir. 2014), the defendant pled guilty pursuant to a plea agreement to one count of using a facility in interstate commerce in the commission of murder-for-hire in violation of 18 U.S.C. § 1958(a). In the plea agreement, the parties contemplated a guideline range of 87 to 108 months based on a base offense level of 32 under U.S.S.G. § 2E1.4(a)(1). *Id*. at 646. However, the Pre-Sentence Report calculated a higher guideline range, 151 – 188 months, using a base offense level of 37 pursuant to U.S.S.G. § 2E1.4(a)(2) – cross-referencing to § 2A1.5(b)(1). *Id.* The court imposed a sentence of 96 months imprisonment. *Id*. at 647. Mr. Smith appealed challenging the application of U.S.S.G. § 2E1.4(a)(1) and § 2A1.5(b)(1). *Id.* The Eight Circuit affirmed the judgment of the district court. *Id.*

The facts of *Smith* are very similar to this case. Mr. Smith sought someone to kill his wife and made a telephone call to a man who happened to be an informant for the Bureau of Alcohol, Tobacco, and Firearms. *Id*. at 646. The informant contacted law enforcement who instructed him to pretend to cooperate with Mr. Smith. *Id.* The informant met with Mr. Smith who gave him information about his wife and offered the informant money to kill his wife. *Id.* Two days later, the informant falsely told Mr. Smith that he had killed his wife. *Id.* Mr. Smith went to the police and reported that his wife was missing. *Id.* Once the police told him they were aware of his plans to hire someone to kill his wife, Mr. Smith confessed. *Id.*

Although the actual guideline range in *Smith* was 151 to 188 months, due to the statutory maximum of ten years imprisonment, the guideline range was restricted to 120 months. And as

noted above, with facts very similar to what happened in this case, the defendant in *Smith* received a sentence of 96 months.

In *United States v. Dotson*, 570 F.3d 1067 (8th Cir. 2009), the defendant was convicted following a jury trial of conspiracy to commit murder-for-hire in violation of 18 U.S.C. § 1958 and conspiracy to deliver a firearm to a convicted felon in violation of 18 U.S.C. § 922(d)(1) and 371. In *Dotson*, the court, in a sufficiency challenge, found that the government had proved that Mr. Dotson was the "right hand man" of a convicted felon (Jackson) who had hired another man to kill the intended victim. *Id*. at 1069. Further, Mr. Dotson conspired with Jackson to procure a weapon for the shooter. *Id.* In addition, the court found sufficient evidence that Mr. Dotson acquired and delivered a firearm to Jackson. *Id.* While the guideline range is not stated in the opinion, it is noted that Mr. Dotson's base offense level was a 37 – like Mr. Ghesquiere's base offense level – pursuant to U.S.S.G. § 2E1.4(a)(2) cross-applying U.S.S.G. § 2A1.5. *Id.* at 1069.[4] While the facts in *Dotson* are not similar to Mr. Chesquiere, Mr. Dotson was a co-conspirator to a murder-for-hire that did not involve law enforcement. In addition, unlike Mr. Ghesquiere, Mr. Dotson went to trial. The court sentenced Mr. Dotson to 120 months on each count consecutive. *Id.* at 1068.

In *United States v. Taplet*, 776 F.3d 875 (D.C. Cir. 2014) the defendant was also charged with soliciting murder-for-hire using interstate facilities in violation of 18 U.S.C. § 1958. In *Taplet*, the defendant hired a man, who happened to be an informant for the Department of Homeland Security, Immigration and Customs Enforcement, to kill the friend of the defendant's girlfriend who encouraged her to end her relationship with the defendant. *Id.* at 877. Mr. Taplet proceeded to trial and was found guilty by a jury. *Id.* Mr. Taplet's guideline range was 262 to 327

[4] The defendant in *Dotson* unsuccessfully challenged this base offense level on appeal. *Dotson*, 570 F.3d at 1069 – 1070.

months but the court imposed the statutory maximum sentence of ten years imprisonment. *Id.* at 877 – 878.

In *United States v. Temkin,* 797 F.3d 682 (9th Cir. 2015), the defendant was charged with solicitation to commit a crime of violence, attempted extortion in violation of the Hobbs Act and use of interstate commerce facilities in the commission of murder-for-hire. In this case, Mr. Temkin went to numerous lengths to extort and murder his long time drug trafficking associate and partner. *Id*. at 686. He solicited and recruited a man to commit the murder but that man was arrested for drug trafficking. *Id.* at 686-687. Temkin then turned to a former attorney offering him money to commit the murder. *Id.* The attorney relayed this information to the intended victim and law enforcement was eventually contacted and became involved. *Id*. 687. Ultimately, an undercover FBI agent posing as a "hitman" contacted Temkin and arrangements were made for the "hitman" to commit the murder. *Id*. Unlike Mr. Ghesquiere, Temkin went to trial and was found guilty of all charges. The district court sentenced Temkin to six years imprisonment. *Id.* at 688.

One of the issues on appeal in *Temkin* was the proper base offense level to use for the counts of conviction. *Id*. at 692-693. Before the district court, the base offense level used was 32. *Id*. The Ninth Circuit found that this was incorrect and that the appropriate base offense level was a 37 and remanded the case for resentencing. *Id*. at 695-696. With the higher guideline range, Temkin was resentenced to 12 years on solicitation and attempted extortion charges and 10 years on the use of interstate commerce facilities in the commission of murder-for-hire charge concurrent. *See United States v. Eugene Darryl Temkin,* No. 2:10cr813, ECF Nos. 255, 256 and 262.

In *United States v. Quevedo*, 633 Fed. Appx. 653 (9th Cir. 2016), defendants Cristobal and Quevedo appealed their sentences after being convicted of conspiracy to use interstate commerce facilities in the commission of murder-for-hire in violation of 18 U.S.C. § 1958(a). Both defendants challenged the cross-reference application in U.S.S.G. § 2D1.4(a)(2) to § 2A1.5(a)(1). *Id*. at 654. Relying on its decision in *United States v. Temkin*, 797 F.3d 682 (9th Cir. 2015), the Ninth Circuit affirmed the decision of the district court and the defendants' sentences. *Id*. at 654-655. In doing so, the court noted that the district court's sentence of 108 months imprisonment for Cristobal was based on its conclusion that she was "the driving force behind the murder-for-hire conspiracy." *Id.* at 654. In addition, the sentence was "12 months below the Guideline range to reflect, in part, her lack of criminal history and her acceptance of responsibility." *Id.* Quevedo's sentence was 84 months imprisonment. *Id.* In both cases, the guideline range was 151 to 188 months but restricted to 120 months due to the statutory maximum of the offense. *See Br. of U.S.*, *United States v. Quevedo,* Nos. 14-50036 and 14-50176, ECF No. 33.

A review of the government's brief in the *Quevedo* appeal[5], reveals that Cristobal disapproved of her daughter's boyfriend and wanted him killed. *See id.* She contacted a person who happened to be an informant for the Bureau of Alcohol, Tobacco and Firearms and like in Mr. Ghesquiere's case, an undercover ATF agent played the role of a "hitman" who agreed to murder the boyfriend for $6,500.00. *Id.* Quevedo was paid $500 as a "finder's fee" for Cristobal. *Id.*

Finally, in *United States v. Lisyansky*, 806 F.3d 706 (2nd Cir. 2015), the defendant was found guilty following a jury trial of conspiracy to commit murder-for-hire and murder-for-hire in violation of 18 U.S.C. § 1958. Lisyansky worked in a restaurant in Queens, New York and the

[5] The unpublished decision does not contain much information about the underlying facts of the offense conduct.

intended murder victims were a father and son who owned a rival restaurant. *Id.* at 708. At the trial it was undisputed that the defendant hired the only witness against him to commit a crime. *Id.* The issue was whether the witness was hired by the defendant to commit robbery or murder. *Id.*

Lisyansky and Rosa - the man he hired to commit the murder - traveled to the intended victims' restaurant for an arranged meeting with them. *United States v. Lisyansky*, 806 F.3d at 708. However, Rosa refused to enter the restaurant due to the presence of too many witnesses. *Id.* The men returned to the restaurant the next day and upon entering the restaurant, Rosa brandished a gun and told everyone to get down. *Id.* Rosa lost his nerve and shot the son in the leg. *Id.* at 708-709. As Rosa fled the restaurant, the father arrived and chased Rosa who shot at him to scare him off. *Id.* at 709. Rosa escaped and met up with Lisyansky and returned the gun he had used to Lisyansky. *Id.* Lisyansky put Rosa up in a hotel for a period of time and also paid him $6,000.00. *Id.*

Lisyansky was sentenced to consecutive sentences of ten years imprisonment for a total sentence of twenty years – the maximum sentence. *United States v. Lisyansky*, 806 F.3d at 708. On appeal, Lisyansky's challenges to the sufficiency of the evidence and the base offense level used to calculate his guideline range were unsuccessful.

The defense respectfully submits that the above cases support a sentence below the guideline range for Mr. Ghesquiere.

## **CONCLUSION**

In short, Mr. Ghesquiere is a good man with no prior record who has served this Country for almost a decade. Mr. Ghesquiere did not want his son to grow up in a bad environment and he made a poor and very misguided decision out of desperation to help his son. Mr. Ghesquiere is

extremely remorseful and ashamed. Mr. Ghesquiere respectfully moves for a sentence below the advisory guideline range. Such a sentence is sufficient to comply with the factors set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

CHADWICK STANLEY GHESQUIERE

By ___________ /s/ _____________________

Keith Loren Kimball, Esquire
Supervisory Assistant Federal Public Defender
Virginia State Bar No. 31046
Attorney for Chadwick Stanley Ghesquiere
Office of the Federal Public Defender
150 Boush Street, Suite 403
Norfolk, Virginia 23510
Telephone: 757-457-0870
Facsimile: 757-457-0880
Email Address: Keith_kimball@fd.org

**CERTIFICATE OF SERVICE**

I certify that on the 17th day of January, 2017, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Kevin M. Comstock, Esquire
Assistant United States Attorney
Office of the United States Attorney
101 W. Main Street, Suite 8000
Norfolk, Virginia 23510
Email: kevin.comstock@usdoj.gov

And I hereby certify that I will email the document to the following non-filing user:

Carmen I. Perez
United States Probation Officer
600 Granby Street, Suite 200
Norfolk, Virginia 23510
Email: Carmen_I_Perz@vaep.uscourts.gov

____/s/________________________
Keith Loren Kimball, Esquire
Supervisory Assistant Federal Public Defender
Virginia State Bar No. 31046
Attorney for Chadwick Stanley Ghesquiere
Office of the Federal Public Defender
150 Boush Street, Suite 403
Norfolk, Virginia 23510
Telephone: 757-457-0870
Facsimile: 757-457-0880
Email Address: Keith_kimball@fd.org